Argued October 25, reargued November 22, reversed and remanded
December 27, 1976, reconsideration denied February 16,
petition for review denied April 26, 1977

In the Matter of the Estate of Robert W. Hill, Deceased
GREAT WESTERN NATIONAL BANK, A
NATIONAL BANKING ASSOCIATION, *Appellant,*
*v.*
HILL, *Respondent.*
(No. 119 196, CA 5915)
557 P2d 1367

*Mark H. Peterman,* Portland, argued the cause for appellant. With him on the briefs were Rives, Bonyhadi & Drummond, Portland.

*Farrand M. Livingston,* Portland, argued the cause for respondent. With him on the brief were Tooze, Kerr, Peterson, Marshall & Shenker, Portland.

Before Fort, Presiding Judge, and Thornton and Richardson, Judges.

FORT, P. J.

## FORT, P. J.

Petitioner, Great Western National Bank, hereinafter referred to as the Bank, appeals from an order of the probate court denying its petition for payment of its claim as a preferred creditor against the estate of Robert W. Hill, hereinafter referred to as Hill, and declaring that it did not have a superior interest in proceeds received by the estate from settlement of a certain lawsuit instituted by Hill and others against a third party, the Wolf Corporation.

Hill had been a borrower of the Bank for many years. On December 21, 1973, the Bank filed a claim against his estate for the $30,113.01 balance of his loan, plus interest, stating that the claim was secured by his assignment of the first net proceeds of any settlement payment up to an amount of $36,022.99 payable to him arising from *Hill v. The Wolf Corporation,* U.S.D.C. Oregon, No. 70-694. On April 4, 1975, pursuant to ORS 115.185, the Bank petitioned for payment of its claim from the proceeds of the Wolf lawsuit then held by the personal representative. The latter had neither disallowed the claim within 60 days of presentment under ORS 115.135, nor paid the claim within the time required by ORS 115.115. By agreement of the parties, the issues in dispute were heard pursuant to the court's powers of declaratory judgment under ORS 111.095, and the pleadings were superseded by a pretrial order.

The personal representative does not dispute either the amount of the claim or that the Bank's status is at least that of a general creditor. The primary question presented is whether the Bank has a right superior to that of unsecured creditors in the Wolf proceeds. To resolve this question, we must determine the legal effect of the alleged assignment by Hill to the Bank as to the Wolf proceeds.

Our review is de novo upon the record. ORS 19.125(3); 111.085; 111.105(1); *State v. Nesbitt,* 23 Or

App 202, 541 P2d 1055 (1975), Sup Ct *review denied* (1976).

■ The burden is upon the Bank, as petitioner, to prove its superior status vis-a-vis the proceeds by a preponderance of the evidence.

The record reveals the following facts.

On October 22, 1970, Price, a vice president of the Bank in its loan division wrote Hill that the balance of Hill's note to the Bank was $61,913.08 and the market value of the collateral securing the loan was $23,250. Price requested a meeting with Hill "to see if it is at all possible to shore up the bank's position * * *."

In November 1970 Price and Hill discussed Hill's loan and Hill sent the Bank title to a house in response to the Bank's request for additional collateral. In December 1970, the Bank requested that Hill consider assigning the proceeds of the Wolf suit to the Bank. There is no evidence that Hill responded to this request at this time.

In September 1971 Price notified Hill that his note had matured on September 7, 1971, the balance due being $36,022.99. Price testified that upon maturation of the note, the Bank had the option of suing Hill for the amount due. Instead, the Bank negotiated with Hill and Price testified on direct examination, without objection, as to a discussion he had had with Hill sometime between September 21, 1971, and October 27, 1971:

"A  We discussed what programs we could have for further liquidation of the debt, what assets he had, and what collateral we could take to shore-up the loan.

"Q  Go ahead. Was the Wolf Corporation lawsuit mentioned?

"A  Oh, yes.

"Q  What was discussed in reference to that?

"A  We discussed an assignment of the proceeds of the Wolf Corporation suit that he had.

"Q   Did you ask that an assignment of the proceeds be made?

"A   Yes.

"Q   Did you use the word 'assignment'?

"A   Yes.

"Q   Did he use the word 'assignment' in the discussions?

"A   I can't recall what his words were.

"Q   What was Mr. Hill's response to the question of the proceeds?

"A   He was willing to do it.

"Q   Did you explain what would be done?

"A   Yes. The assignment would be made to the Bank of the first proceeds had of the Wolf Corporation suit.

"Q   How was this physically to be handled?

"A   It was supposed to be handled by his attorneys, and he was to write a letter to his attorneys instructing them that we have an interest, a security, an assignment of the proceeds of the suit to the Bank.

"Q   Did you explain to him that is what you wanted him to do?

"A   Yes.

"* * * * *

"Q   [by counsel for the Bank] During that matter, was there any discussion by either you or Mr. Hill that you would use the proceeds from the Wolf Corporation lawsuit simply as a source from which Mr. Hill would pay you?

"A   Simply as a source? It was assigned as collateral, assigned as security.

"Q   In your understanding of what you have explained to Mr. Hill, was the money to go from the attorneys to Great Western, or from the attorneys to Mr. Hill and then to Great Western?

"A   No, the money was to go—the attorneys would be receiving the money and the money was to go from the attorneys to the bank.

"* * * * *

"Q   * * * I would like to backtrack, Mr. Price. During the discussion, was there mention of what the bank was actually getting in the assignment?

"A   The proceeds. They were getting money to pay the loan off.

[ 897 ]

"Q From where would that money come?

"A It would come from the Wolf Corporation through the attorneys on settlement of the suit to the bank.

"Q Were you aware of a lawsuit by Mr. Hill against the Wolf Corporation?

"A Oh, yes.

"Q Did he discuss this with you?

"A Yes.

"Q Was the assignment to include settlement for judgment only, or did it matter?

"A The assignment was to cover the proceeds of the money.

"Q Did it matter whether the proceeds came from settlement of the lawsuit or a judgment on that lawsuit?

"A No."

Following the oral negotiations mentioned above, on October 27, 1971, Hill wrote to his attorney, George Rives, who was also throughout this period general counsel for the Bank, whom he now represents in this negotiation:

"In reference to the Wolf-69 suit now being handled by your firm I have agreed with Mr. Robert Price of the Great Western Bank that the first net proceeds of any settlement payment up to an amount of $36,022.99 or the net amount owed by me at the time shall be paid to them.

"Your acknowledgement to the Great Western Bank of this arrangement will be appreciated."

He enclosed a copy of the above letter in his letter of the same date to Price:

"I have enclosed a copy of my letter to Mr. George Rives instructing him to pay the first net proceeds of the Wolf-69 suit to the Great Western Bank along with the notes payable of Warden Leasing Company payable to Robert W. Hill and my signed note payable to the Great Western Bank.

"I want to thank you and your bank for the courtesies extended me and regrest [sic] the amount of time on your part needed to review the collateral for my loan."

On November 5, 1971, the Bank renewed Hill's

loan, and the loan request stated "Repayment to come from proceeds of Wolf suit now in process, liquidation of securities, and income."

On January 24, 1972, Mr. Rives wrote the Bank:

> "Pursuant to request of Mr. Robert W. Hill, we hereby acknowledge the arrangement between Mr. Hill and Great Western National Bank that the first net proceeds of any settlement payment to Mr. Hill in *Robert W. Hill v. The Wolf Corporation, et al,* up to an amount of $36,022.99 or the net amount owed by him to the Bank at the time shall be paid to Great Western National Bank."

Price testified that the Bank did not file a financing statement with respect to the assignment because he did not think it was necessary; that to him it was perfected when the attorneys acknowledged the assignment; and that he did not view it as a "regular type of collateral."

On December 5, 1972, judgment was entered in the Wolf lawsuit in favor of the plaintiffs. On December 28, 1972, Wolf Corporation assigned certain property to the plaintiffs, and the plaintiffs covenanted not to execute the judgment.

On June 4, 1973, Hill signed a promissory note for $30,113.01.

Price testified that sometime in 1973 he became aware that Hill had changed attorneys. On July 6, 1973, Price wrote to Hill:

> "I notice that Gil has taken a new note for 120 days and after reading his write-up in the file it would appear that if the SBA does not come through, we are relying more and more on the Wolf corporation suit.
>
> "To give the bank something to hang their hat on and a little bit of security to shore up the loan I request that you address a letter to your present attorney and state to him that you are irrevocably assigning your interest to the Great Western National Bank in the suit of Robert W. Hill v. The Wolf Corporation, et al, in the amount of $30,113.01.

"Bob, you will recall that you have previously executed such a letter over your signature to your former attorneys but we understand that you now have other attorneys and we would like the same irrevocable assignment to the bank through your new attorney.

"This in effect would shore up the loan and as stated would give the bank a better secured position.

"Please address such a letter and have your attorney acknowledge it and send the acknowledged copy to this bank."

Price testified that the reason he wrote Hill was:

"A  He changed attorneys and the money was to come through the attorneys. * * *

"* * * * *

"Q  Did you consider that letter to his attorney a necessary element of continuation of the assignment to the bank?

"A  I thought they should be put on notice, yes.

"Q  For notification purposes?

"A  Yes."

Price went on to testify:

"Q  * * * During the entire time between October 27, 1971 and until Mr. Hill's decease, you were in contact with him during the Wolf Corporation lawsuit a number of times; is that correct?

"A  That is correct.

"* * * * *

"Q  * * * Was the term 'assignment' mentioned by you in these conversations?

"A  Yes.

"Q  Was there any objection to that use of the word by Mr. Hill?

"A  No.

"Q  Were there ever any questions about the meaning of the word 'assignment' from Mr. Hill?

"A  No.

"Q  After the letter of July 6, 1973 was written to Mr. Hill, was there any response from him asserting that the first letter was not an assignment?

"A  No."

The requested letter was not written to his new

attorneys by Mr. Hill. Hill died August 26, 1973. A final accounting has not been filed by the personal representative. No evidence was presented which proved that his estate is insolvent.

The Bank contends that it has a superior right to the Wolf proceeds by reason of its status as either (1) a secured creditor under ORS ch 79, (2) equitable assignee, or (3) beneficiary of a constructive trust, or any of them.

We deal first with the Bank's contention that Hill granted it a security interest in the Wolf proceeds under ORS ch 79.

Our initial question is whether ORS ch 79, which is Article 9 of the Uniform Commercial Code, applies to the parties' transaction. At trial the Bank took a different position than that taken here. It there argued that ORS ch 79 does not apply because ORS 79.1040(8) excludes from the coverage of ORS ch 79 "a right represented by a judgment." However, the Bank at trial testified that it had been granted a right to the Wolf proceeds whether such proceeds came from settlement or execution of a judgment, and that it had no right to make a demand upon the Wolf Corporation. We conclude that the Bank does not claim "a right represented by a judgment" and note that at the time of the assignment, Hill's claim against the Wolf Corporation had been neither settled nor reduced to judgment.

The Bank now argues on appeal that its right to the Wolf proceeds is properly characterized as a general intangible, and directs our attention to *Friedman, Lobe & Block v. C.L.W. Corporation,* 9 Wash App 319, 512 P2d 769 (1973), where under similar facts the court applied Article 9 of the Uniform Commercial Code:

> "* * * Our concern is with the assignment of a portion of the expected recovery of C. L. W.'s pending lawsuit against the Bank of the West which was given as security for the loan and accounting services. * * *

[ 901 ]

"The assignment of a portion of an expected recovery from a cause of action is more aptly categorized under the Uniform Commercial Code as an assignment of a 'general intangible,' a catchall category covering 'any personal property (including things in action) other than goods, accounts, contract rights, chattel paper, documents and instruments.' RCW 62A.9-106. * * *" 9 Wash App at 321-22.

We note that on appeal the personal representative does not appear to contest the applicability of ORS ch 79. Her position is that under that chapter no security interest was granted, or, alternatively, that any security interest granted was voidable by her as personal representative of an insolvent estate.

We conclude that the entity in which the Bank is claiming a security interest is a general intangible and that ORS ch 79 applies.

Under ORS ch 79, a secured transaction is a "* * * transaction (regardless of its form) which is intended to create a security interest * * *." ORS 79.1020(1)(a). The security interest may be created by contract, including by assignment. ORS 79.1020(2). "Security interest is defined in ORS 71.2010(37) as "an interest in personal property * * * which secures payment or performance of an obligation." The question is whether Hill assigned the Bank the right to a portion of the Wolf proceeds for the purpose of securing his repayment of the loan.

ORS 79.2030(1) sets forth the requirements for creation of an enforceable security interest:

"* * * [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

"(a) The collateral is in the possession of the secured party pursuant to agreement, *or the debtor has signed a security agreement which contains a description of the collateral * * *; and

"(b) Value has been given; and

"(c) The debtor has rights in the collateral." (Emphasis supplied.)

[ 902 ]

The Bank, therefore, must prove that (1) Hill had rights in the Wolf proceeds, (2) it gave Hill value for his agreement to pay them, and, because a security interest in a general intangible cannot be possessory, (3) Hill signed a security agreement as collateral which described the Wolf proceeds.

In their pretrial order, the parties stipulated that as of October 27, 1971, Hill was the plaintiff in the Wolf lawsuit and had the right to receive any proceeds realized from that lawsuit.

■ The petitioner renewed Hill's loan on the basis of his agreement to pay from the proceeds of the Wolf lawsuit. We agree with the probate court's finding that this renewal constituted the giving of value.

ORS 79.1100 provides that "* * * any description of personal property * * * is sufficient whether or not it is specific if it reasonably identified what is described." As the Supreme Court noted in *J. K. Gill Company v. Fireside Realty,* 262 Or 486, 499 P2d 813 (1972), the comment to this section states:

> " '* * * Under this rule courts should refuse to follow the holdings, often found in the older chattel mortgage cases, that descriptions are insufficient unless they are of the most exact and detailed nature, the so-called 'serial number' test * * *.' " 262 Or at 489.

Although the October 27, 1971, letter does not define the term "net proceeds," its meaning is clarified by the parties' course of dealing. We note ORS 71.2050(1), (3) and (4):

> "(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.
>
> "* * * * *
>
> "(3) A course of dealing between parties * * * give[s] particular meaning to and supplement[s] or [qualifies] terms of an agreement.

[ 903 ]

"(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade."

Price testified that he did not recall discussing with Hill whether his attorney would be paid out of the proceeds before the petitioner. Counsel here for the Bank, who was also counsel for Hill in the Wolf litigation and in his dealings with the Bank until shortly before his death, stipulated to the fact that its firm at the time of trial already had received in excess of $20,000 from the Wolf proceeds in payment of attorney fees pursuant to the attorney's lien under ORS 87.445, formerly 87.495(2).

Price also testified that he and Hill had not agreed that expenses such as costs of administration would be paid before the Bank, but that instead Hill had promised the Bank "the first right to the proceeds of that suit that came in before anyone else was paid."

We conclude that "first net proceeds" as provided in the letter reasonably identified the entity in which the Bank can claim security: total proceeds minus attorney's lien under ORS 87.445. Thus our inquiry focuses upon whether the Bank has proved that the final requirement for an enforceable security interest was also satisfied, namely, was the October 27, 1971 letter, signed by Hill, a security agreement within the statute.

ORS 79.1050(1)(L) defines "security agreement" as "an agreement which *creates* or *provides for* a security interest." (Emphasis supplied.) An "agreement" is defined as "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing * * *." Our

[ 904 ]

Supreme Court in *J. K. Gill Company v. Fireside Realty, supra,* has stated in construing what is now ORS 79.2030(1)(a):

> "The official comment to this section states:
>
> " '3. One purpose of the formal requisites stated * * * is evidentiary. The requirement of written record minimizes the possibility of future dispute as to the terms of a security agreement * * *.'
>
> "Paragraph 5 of the comment provides:
>
> " 'The formal requisites stated in ORS 79.2030 are not only conditions to the enforceability of a security interest against third parties. They are in the nature of a Statute of Frauds. * * *'
>
> "The security agreement is the evidence of the contract of the debtor and creditor. * * * The security agreement, like any other contract, must be sufficiently certain in its terms so as to evidence the agreement of the parties." 262 Or at 488.

White and Summers, Uniform Commercial Code, § 23-4 (1972), note 20 at 791, stresses that

> * * * [I]t is not necessary that a writing *create* the security interest * * *. The purpose of a writing is merely evidentiary * * *. Courts should be willing to focus on the 'provide for' language of [ORS 79.1050(1)(L).] Presumably it is not superfluous, not synonymous with 'create.' Notice that Comment 4 of [ORS 79.2030] indicates that a security agreement does not require a special type of document."

■ From testimony and exhibits reflecting the parties' course of dealing, we find that Hill intended to create a security interest in the Wolf proceeds in favor of the Bank and to provide for that security interest in his October 27, 1971, letters to his attorney and pursuant thereto from the attorney's letter to the Bank.

Although we note that the parties did not use great care in framing their transaction, we conclude as a matter of law that the requirements of ORS ch 79 necessary to grant petitioner a security interest in the first net proceeds were satisfied.

■ We next consider whether the bank is entitled to

payment of its claim from those proceeds. This depends upon its precise status vis-a-vis the personal representative.

Price testified that the Bank did not file a financing statement as required by ORS 79.3020 to perfect a security interest in a general intangible. The Bank's status is therefore that of an unperfected secured creditor. The Bank contends, however, that the personal representative stands in the shoes of her decedent and therefore the contest over priority in the proceeds is that of a secured creditor versus a debtor. ORS 79.2010 and 79.2030 resolve such a contest in favor of the secured creditor.

The personal representative, however, contends that her status is that of a lien creditor, rendering the contest one between an unperfected secured creditor versus a lien creditor, which ORS 79.3010(1)(b) resolves in favor of the lien creditor.

ORS 79.3010(3) defines "lien creditor" as

"* * * a creditor who has acquired a lien on the property involved by attachment, levy, or the like and includes an assignee for benefit of creditors from the time of assignment, and a trustee in bankruptcy from the date of the filing of the petition or a receiver in equity from the time of appointment."

This definition does not describe a personal representative of an estate.

The personal representative calls our attention to an annotation, 91 ALR 299 (1934) indicating that many jurisdictions prior to enactment of the Uniform Commercial Code allowed the personal representative of an insolvent estate to invalidate an unrecorded chattel mortgage, and she contends that Oregon should adopt that approach here. However, the comment to ORS 79.3010 states that

"the section rejects the rule applied in many jurisdictions in pre-Code law that an unperfected security interest is subordinated to all creditors."

We read the definition of "lien creditor" and this comment to indicate that a personal representative can enjoy no better position vis-a-vis an unperfected secured creditor than could the decedent. We note, too, that this is not a case where the security interest held by petitioner was "transferred by the decedent with intent to defraud his creditors or transferred by any means which is in law void or voidable as against his creditors." ORS 114.435. An unperfected security interest under ORS ch 79 is not void or voidable; it is merely of a lesser priority than a perfected security interest. Thus, the personal representative lacks authority to void it under ORS 114.435.

We conclude that the Bank has an unperfected security interest in the net proceeds of the Wolf suit which the personal representative is not authorized to invalidate.

In light of this conclusion, we need not reach the other issues raised by the parties.

Reversed and remanded.