**Buehl Estate**

*Albert Oehrle,* for estate.

*William Butler, IV* and *Craig Walker,* for claimant.

WOOD, J., January 22, 1982—Air Charter GMBH (ACS) has filed a claim for $870,000 against the Estate of Uwe M. Buehl. ACS and the estate, on August 26, 1980, signed an agreement (hereinafter agreement) covering the various aspects of this claim, and ACS asks us to approve it under §3323(a) of the Probate, Estate and Fiduciaries Code (PEF). The basic premise of ACS's claim and the agreement, is that ACS had a security interest in certain of Buehl's assets at his death. We must first determine if that is so.

The relevant facts are as follows:

On October 19, 1979, Uwe Buehl bought a Mitsubishi MU2N from ACS in Germany. ACS retained title (that is, a security interest) under the sales agreement, but no financing statement "perfecting" that security interest was filed in Pennsylvania until June 1980, two months after Buehl's death.[1] The purchase price of the MU2N was

---

1. This filing occurred more than four months after the MU2N was introduced into Pennsylvania, and so was effective only from the date of filing. Had it occurred within four months of introduction, it would have related back to the original sale date: 13 Pa. C.S. §9401(c).

$800,000; Buehl paid $100,000 down, and then brought the aircraft to Pennsylvania and later sold it to Corporate Air Service, Inc., in California, and received in return a Mitsubishi MU2G and $595,000 in cash. At Buehl's death, the MU2G was still in his possession, but the parties have not, on this record, traced, located, or identified the current whereabouts of the $595,000.

On December 20, 1979, Buehl also purchased a Cessna 421B from ACS, who again reserved title. The purchase price was $270,000, of which Buehl paid $100,000 down and nothing further thereafter. Buehl still had possession of the Cessna at his death.

After Buehl died, the estate and ACS executed the agreement, expressly subject to this court's approval. Under it, ACS took possession of the Cessna and gave the estate credit for the full balance of the purchase price. We are told the Cessna was resold for $86,000. ACS also took possession of the MU2G and sold it for $293,000, which sum is currently held in escrow, pending the outcome of these proceedings. There are some minor credits and setoffs which are recognized under the agreement, but the overall effect of it is that ACS is saying to estate, we will give you credit for the full purchase price of the Cessna if you will give us the proceeds of the MU2G, plus any of the $595,000 we can trace and identify, and permit us to be a general creditor as to the balance.

As to the MU2N, the question now before us is the nature of ACS's security interest in the proceeds of the MU2N vis-a-vis the interest of the creditors of Buehl's Estate, which is insolvent. The question necessarily requires an examination of the "Uni-

form Commercial Code": 13 Pa. C.S. §1101 *et seq.*[2]

Since ACS retained title in the MU2N it reserved a security interest in that aircraft: 13 Pa. C.S. §2401. Moreover, there is no dispute that ACS's security interest in the Mitsubishi MU2N "attached" on October 19, 1979: 13 P.S.A. §9204.

13 Pa. C.S. §9303 provides that a security interest is "perfected" when it attaches and when all the applicable steps for perfection have been performed: 13 Pa. C.S. §9302, 9304, 9305 and 9306. 13 Pa. C.S. §9302 requires a financing statement to be filed to "perfect" all security interests except in certain instances not applicable here. It is clear that in an insolvent estate, the rights of creditors are fixed at the date of the decedent's death: In Re: Schumann Estate, 28 Fiduc. Rep. 433 (1978). Since the decedent died before ACS filed its financing statement, we must conclude that in relation to the estate and creditors of the estate, ACS's security is not perfected. Further, as the result of the sale of the MU2N

---

2. The UCC becomes important in this manner: the Probate, Estate and Fiduciaries Code §3392, 20 Pa. C.S. §3392, sets up the order of payment of claims against estates, and this claim, whether secured or not, falls in the 6th and last category: "All other claims, including claims by the Commonwealth." The question then becomes, do all category six claims receive the same priority? Apparently not. The books are replete with cases giving the Commonwealth priority over other claims, and there are suggestions in some cases (although our current issue is not squarely faced) that secured claims receive priority over other claims: see Baker's Estate, 47 D.&C. 444 (1942); Alexander's Estate, 31 D.&C. 17 (1938). PEF §3381 says that "[N]othing in this Code shall be construed as impairing any lien or charge on real or personal estate of the decedent which existed at his death." Therefore we conclude that the PEF defers to the UCC in the determination of the rights of a secured creditor against those of an unsecured creditor.

(the collateral), ACS's unperfected security interest is only in the identifiable proceeds of the sale: 13 Pa. C.S. §9306(b).

13 Pa. C.S. §9301(a) makes an unperfected security interest subordinate to a person who becomes a "lien creditor." "Lien creditor" is defined as a

"creditor who has acquired a lien on the property involved by attachment, levy or the like and includes an asignee for benefit of creditors from the time of assignment, and a trustee in bankruptcy from the date of the filing of the petition or a receiver in equity from the time of appointment. Unless all the creditors represented had knowledge of the security interest such a representative of creditors is a lien creditor without knowledge even though he personally has knowledge of the security interest": 13 Pa. C.S. §9301(c).

Thus, if the executrix of the estate is a "lien creditor," ACS's security interest will be vitiated and ACS will occupy the same status as a general creditor of the estate.

Our research discloses only two cases concerning the question of whether or not an administrator of an estate takes the position of a "lien creditor" within the meaning of Article 9 of the Uniform Commercial Code: Estate of Hill, 27 Ore. App. 893, 557 P.2d 1367 (1976), review denied, 278 Or. 157 (1977); Estate of Hinds, Cal. App. 8 UCC 3 (1970). Both hold that they do not. Moreover, Hinds states that the executor or administrator is not a lien creditor even though the estate is insolvent. Certainly the executrix here is authorized to act in some fiduciary capacity for the creditors but that does not make her a lien creditor under 13 Pa. C.S. §9301(c). 13 Pa. C.S. defines "creditor" as including an executor. The legislature could have easily included executors and administrators of insolvent

estates in the definition of "lien creditor" if it chose to do so, but did not. We therefore hold that an executor or administrator is not a "lien creditor" in Pennsylvania, under the UCC. To do otherwise would impair ACS's "lien or charge," contrary to PEF §3381.

That does not completely solve the riddle of the UCC as it applies to this case, however. ACS did retain an unperfected security interest in its collateral; will that extend to proceeds? We return to various definitions in the UCC. "Insolvency proceedings" are defined to include "any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate the estate of the person involved". 13 Pa. C.S. §1201. We must concede therefore, that this is an "insolvency proceeding." The code specifically provides for the effect of insolvency proceedings on the rights of a secured party in "proceeds": 13 Pa. C.S. §9306(d). That subsection provides that a person with a perfected security interest in proceeds at the commencement of the insolvency proceedings retains a perfected security interest in certain kinds of proceeds listed in that subsection. Does this mean that because ACS had not perfected its security interest, it lost that interest altogether?

The code does not speak to that question. However, since the executrix is not transformed into a "lien creditor" by virtue of her decedent's death, we assume that she simply becomes his successor in interest, with the same rights and duties as she would have had, were he still living. This view is again consistent, we note, with PEF 3381, quoted in footnote 1, supra. In this situation, 13 Pa. C.S. §9306(b) tells us that " . . . a security interest continues in collateral notwithstanding sale . . . , and also continues in any identifiable proceeds . . . " .

Thus, as between creditor ACS and debtor estate, ACS continues to retain its security interest (albeit unperfected) in the proceeds of the collateral, the Mitsubishi MU2N.

Here the only identifiable proceeds of the MU2N are the funds held in the Citibank N.A. escrow account. We will therefore direct that those funds be released to ACS.

ACS requests an order directing the estate to assist it in tracing other identifiable proceeds of the MU2N. This we decline to do, since we believe ACS had ample opportunity to trace proceeds, and should have done so as part of the presentation of its claim. We are willing to give ACS its day in court, but not endless days.

As to the Cessna 421B, as noted earlier, ACS retained title to that aircraft pursuant to the purchase agreement between the parties and thus retained a security interest in it: 13 Pa. C.S. §2401. Pennsylvania law permits a secured party to foreclose on its collateral once the debtor is in default under a security agreement: 13 Pa. C.S. §9501, 9503. The aircraft was repossessed by ACS on February 23, 1981. Pursuant to 13 Pa. C.S. §9504 ACS sold the Cessna and received net proceeds in the amount of $86,522.83 after deducting its expenses for retaking, holding and sale preparations. The agreement of August 25, 1980, gives the estate a $270,000 credit for the return of the Cessna. In the event we do not approve that agreement, ACS seeks a deficiency judgment in the amount of $83,477.17 pursuant to 13 Pa. C.S. §9504(b).

ACS also seeks approval of their attorney fees, which, according to exhibit C-6, currently amount to almost $40,000. The agreement between the estate and ACS calls for ACS to receive credit for attorney's fees "as such might be allowed by the Uni-

form Commercial Code": paragraph 3(a) ACS points us to 20 Pa.C.S. §9504(a)(1), which, in establishing the order of distribution for proceeds of reclaimed collateral, includes, "to the extent provided for in the Agreement and not prohibited by law, the reasonable attorney's fees and legal expenses incurred by the secured party." We think that the phrase "the agreement" refers to the original sales agreement covering the two aircrafts, and not the agreement subsequently worked out between the estate and ACS, for which approval is sought here. We have examined the translations of the original agreements (ACS exhibits 3 and 7) and find no mention of attorneys' fees. Counsel has pointed to no other basis for awarding such fees, and our research has disclosed none. We therefore conclude that none are due under the agreement.

What we are left with, then, is the following:

ACS did have a security interest in both the Cessna and the MU2N, and this security interest attached to the MU2G as well, as a proceed of the MU2N. Therefore, ACS is entitled to the proceeds of the sales of both planes. Furthermore, the compromise reached regarding the Cessna is appropriate, and represents an advantage to the estate. On the other hand, the UCC does not authorize attorneys' fees in this situation, and none are due ACS. We find all of these conclusions compatible with the agreement, and we approve it as so interpreted.

## ORDER

And now, this January 22, 1982, we approve the agreement dated August 26, 1980, between ACS and the estate, and as a consequence:

1. Direct that Citibank may release the escrow fund held in account no. 792560 to ACS;

2. Direct that ACS otherwise be considered a general creditor against the estate in the amount of $302,245, without interest to the date of this order (that amount representing the court's calculation of the debt adjusted for credits on both sides, but with no credit for an attorney's fee, as set forth in paragraph three of the agreement);

3. Dismiss all other claims of ACS except as noted above.