In the Matter Of BABCO, INC., d/b/a Babco Oil Co., Debtor.

CONNECTICUT NATIONAL BANK, Movant,

v.

BABCO, INC., d/b/a Babco Oil Co., Thomas C. Boscarino, Trustee, Respondents.

Bankruptcy No. 2–90–01155.

Motion No. 2–90–0444M.

United States Bankruptcy Court, D. Connecticut.

Nov. 4, 1991.

Thomas A. Gugliotti, Paul M. Gaide, Mark D. G. Sanders, Schatz & Schatz, Ribicoff & Kotkin, Hartford, Conn., for movant.

Patrick W. Boatman, John H. Grasso, Boatman & Boscarino, Glastonbury, Conn., for trustee-respondent.

MEMORANDUM OF DECISION AND ORDER RE: MOTION FOR RELIEF FROM STAY FILED BY CONNECTICUT NATIONAL BANK

ROBERT L. KRECHEVSKY, Chief Judge.

## I.

### ISSUES

The major issues in this relief from stay proceeding are the binding effect of a court order approving a stipulation between a debtor and its financing bank entered during a superseded chapter 11 case, whether the bank held a prepetition security interest in certain of the debtor's property, and whether trust principles should be applied to carry out the asserted purposes of a security agreement.

## II.

### BACKGROUND

Babco, Inc. d/b/a Babco Oil Co., the debtor, was a wholesale distributor of automotive products when it filed a chapter 11 petition on June 12, 1990. The court, on the motion of the unsecured creditors' committee, converted the debtor's case to one under chapter 7 on September 5, 1990, and the creditors elected Thomas C. Boscarino chapter 7 trustee. Connecticut National Bank (CNB) had been the debtor's financing source since June 19, 1985 under a two-million-dollar secured account-receivable lending arrangement. The debtor, pursuant to this financing arrangement, had granted CNB a duly-perfected security interest in the debtor's existing and after-acquired "accounts, chattel paper, instruments and general intangibles ... including, without limitation ... rights of payment under contracts not yet earned by performance and accrued receivables arising therefrom ..., and the products and proceeds ... of the forgoing...."[1] The security agreement did not include the debtor's inventory. CNB's Exhibits A through E.

During December 1989, Interdynamics Corporation (Interdynamics) sold on credit and delivered to the debtor a large quantity of canned Freon gas. In April 1990, the debtor, having become liable for unanticipated federal excise taxes on the Freon, paid $355,104.00 to satisfy this obligation. During the same period, Interdynamics was pressing the debtor for payment and the debtor was unable to interest its cus-

---

1. The security agreement provided that the Uniform Commercial Code, as adopted in Connecticut, would "govern the security interest provided for herein." CNB's Exhibit C at 2.

tomers in the Freon. After negotiation, the debtor returned the Freon inventory to Interdynamics in exchange for reimbursement for the paid federal excise taxes and cancellation of its account payable. Charles Clark, the debtor's vice-president for finance, testified that he was not aware of any writing on which this exchange was based. Although it maintained its operating checking account at CNB, the debtor, on May 7, 1990, deposited the $355,104.00 check received from Interdynamics (the reimbursement funds) in a checking account at Connecticut Bank and Trust Company (CBT). Clark testified that the purpose in placing reimbursement funds in the CBT account was to assure available operating funds if CNB were to set off the debtor's bank accounts located at CNB against the debtor's unpaid obligations.[2] Clark, starting on May 14, 1990, invested and reinvested the funds at CBT in a series of short-term, one-day or one-week, treasury bills.

As noted, the debtor filed its chapter 11 bankruptcy petition on June 12, 1990.[3] On June 25, 1990, the debtor and CNB signed a "Stipulated Emergency Order For Use Of Cash Collateral And For Adequate Protection" (the stipulation) in which the debtor acknowledged it was indebted to CNB for $1,450,000.00 for unpaid loans; that the debtor requested and CNB agreed to increase these loans by $750,000.00 upon a final court order so authorizing; that CNB was willing to permit the debtor to use $250,000.00 of CNB's cash collateral on an emergency basis to avoid irreparable harm to the debtor in return for CNB receiving a security interest in all of the debtor's assets as adequate protection for use of such collateral. The stipulation further provided as to the $250,000.00 emergency use of cash collateral: "Said Cash Collateral shall first be drawn from cash which the Debtor has on deposit with Connecticut Bank and Trust Company." Trustee's Exhibit 1 at 4.

The debtor's counsel requested the court to hold a hearing on the stipulation with notice shortened to 24-hour telephonic and overnight mail notice to limited creditors because of the need to meet the debtor's payroll. On June 29, 1990, at a hearing where no creditors appeared, the court approved the stipulation. The debtor thereafter used $240,883.07 of the funds in the CBT account for operations prior to conversion of the case to chapter 7.

CNB's motion for relief from stay, dated August 8, 1991, seeks, in part, to exercise its rights under the June 29, 1990 court-approved stipulation and recover $240,-883.07 pursuant to the adequate protection provision. The trustee, after his appointment, objected to this relief contending that the debtor had never used any CNB cash collateral, notwithstanding the language of the court-approved stipulation, in that the funds in the CBT account were not subject to CNB's prepetition security agreement.

### III.

### DISCUSSION

#### A.

#### 11 U.S.C. § 549

CNB initially argues that the trustee is barred from attempting to avoid the post-petition adequate protection lien granted CNB because he is authorized under 11 U.S.C. § 549 only to avoid postpetition transfers of property "that [are] not authorized under this title or by the court."[4] The trustee, however, does not seek to avoid any transfer. Pursuant to the stipulation, CNB has a lien on the debtor's assets to the extent of cash collateral used. The trustee's argument is that the funds used postpetition by the debtor were not covered under CNB's prepetition security

---

**2.** The CNB promissory note dated June 19, 1985 contained provisions granting CNB a right of setoff for all liabilities against the debtor's deposits at CNB.

**3.** The overriding cause of the debtor's bankruptcy filing was its inability to collect a $2,200,-000.00 receivable from Ames Department Store,

Inc., which had filed its own bankruptcy petition in April, 1990.

**4.** 11 U.S.C. § 549(a) provides, in part:
[T]he trustee may avoid a transfer of property of the estate—(1) that occurs after the commencement of the case; and (2) ... (B) that is not authorized under this title or by the court.

agreement, and that no cash collateral of CNB was used.

## B.

### Effect Of The Stipulation

■ CNB next contends that the statement in the stipulation that "[s]aid Cash Collateral shall be first drawn from cash which the debtor has on deposit with Connecticut Bank and Trust Company" has the effect of a court-approved admission by the debtor that CNB had a perfected security interest in the reimbursement funds on deposit at CBT. CNB relies primarily upon *In re Knudson,* 929 F.2d 1280 (8th Cir. 1991); and *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.),* 67 B.R. 899 (Bankr.E.D.Tenn.1986), for the proposition that the stipulation, even if based upon erroneous facts, binds the trustee. Neither of the cited authorities are on point. In *Knudson,* a trustee claimed, two years after the event, that a stipulation clearly stating that the existence of a bank's claimed security interest in listed collateral was in dispute, and resolving the issue in favor of the bank in consideration of the debtor's right to use the collateral, either (1) had not been approved by the bankruptcy court or (2) had not been properly noticed for hearing. The court found against the trustee on both grounds. The holding of *Chattanooga* is simply that payments made under a confirmed chapter 11 plan are not recoverable by a trustee after conversion of the case to one under chapter 7.

The trustee argues that the court has discretion to consider whether the stipulation should be vacated upon equitable grounds. It is well settled that bankruptcy courts, as courts of equity, have the power to reconsider, modify or vacate their previous orders, including those approving stipulations, if the interests of justice so require and if no intervening rights would be prejudiced by this action. *See In re Lenox,* 902 F.2d 737, 739–740 (9th Cir.1990) ("stipulations are not to be lightly set aside … [but] bankruptcy courts, as courts of equity, have the power to reconsider, modify or vacate their previous orders so long as no intervening rights have become vested in reliance on the orders"); *In re Texlon*

*Corp.,* 596 F.2d 1092, 1100 (2nd Cir.1979) (bankruptcy court has discretion to rehear cause even after expiration of appeal period if no intervening right will be prejudiced by its action); *A & A Sign Co. v. Maughan,* 419 F.2d 1152, 1155 (9th Cir.1969) ("The bankruptcy court in exercise of its equitable powers can set aside a stipulation entirely if the interests of justice so require and if the parties can be restored to the positions they occupied before they entered into the stipulation.").

The trustee seeks to have part of the stipulation stating that the CBT funds constituted cash collateral set aside because it is wrong as a matter of law, estate creditors lacked an effective opportunity to review the stipulation submitted by the debtor and CNB prior to the hearing, the debtor's action in executing to the stipulation was not in the best interest of the estate and is unexplainable. The Second Circuit in *In re Texlon* noted:

> The debtor in possession is hardly neutral. Its interest is in its own survival, even at the expense of equal treatment of creditors, and close relationships with a lending institution tend to prevent the exploration of other available courses in which a more objective receiver or trustee would engage.

596 F.2d at 1098.

I conclude the order approving the stipulation should be set aside. There are no intervening interests at stake in this matter, and CNB has not alleged any reliance upon the stipulation. CNB did not lend the debtor any additional funds; it merely purported to permit the debtor to use funds in which, it is alleged, CNB had no interest. The order approving the stipulation, accordingly, is vacated insofar as it approved the sentence "Said Cash Collateral shall first be drawn from cash which the Debtor has on deposit with Connecticut Bank and Trust Company."

## C.

### CNB's Claimed Prepetition Security Interest In The Reimbursement Funds

■ The security agreement executed by the debtor granted CNB a security interest

in the debtor's "accounts, ... instruments and general intangibles ... including without limitation ... rights of payment under any contracts not yet earned by performance and accounts receivable therefrom...." CNB's Exhibit C at 1–2. CNB concedes that the reimbursement funds do not constitute an account. Rather, CNB claims that the reimbursement funds constitute proceeds from a general intangible,[5] either a chose-in-action or an executory contract.

■ Notwithstanding the authority cited by CNB that a right to payment which accrues as the result of a "legal right or entitlement" is considered a chose-in-action which falls under the UCC definition of a general intangible,[6] the record is devoid of any evidence suggesting that the debtor ever asserted any legal right or entitlement for the excise taxes paid. Even assuming, as CNB suggests, that the debtor might have had a claim against Interdynamics for failure to disclose information to the debtor of a possible federal excise tax levy, transfers "in whole or in part of any claims arising out of tort ..." are excluded from Article 9 coverage. Conn.Gen.Stat.Ann. § 42a–9–104(k) (West 1990). Under Connecticut law, intentional withholding of information is the equivalent of a fraudulent misrepresentation, *Pacelli Brothers Transportation, Inc. v. Pacelli*, 189 Conn. 401, 407, 456 A.2d 325, 328 (1983), and fraudulent misrepresentation is an action in tort rather than in contract, *Design Coatings, Inc. v. Natural Gas Co., Inc.*, No. CV 87–0088318S, 1991 W.L. 126432, at *2 (Conn.Super.Ct. June 26, 1991).

■ The record made in this proceeding is also totally barren of any proof of an existing contractual right of reimbursement. The trustee argues that the reimbursement funds are best characterized as proceeds from the "sale, exchange, collection or other disposition" of inventory and, as such, are not covered by the security agreement. *See* Conn.Gen.Stat. § 42a–9–306(1).[7] I conclude that the transaction between the debtor and Interdynamics was a contemporaneous exchange of inventory for a cash payment and cancellation of the indebtedness owed on the inventory. The reimbursement funds are not proceeds from a general intangible to which CNB's security interest attached.

### D.

### *CNB's Claimed Security Interest In Treasury Bills*

■ CNB alleges that its prepetition security interest attached to the treasury bills the debtor purchased with the funds held in the CBT account. Although it is unclear whether the treasury bills were certificated (evidenced by an instrument) or uncertificated ("book-entry"), the provisions of Article 8 of the Uniform Commercial Code govern such transactions. *See Oscar Gruss & Son v. First State Bank of Eldorado*, 582 F.2d 424, 426 (7th Cir.1978) ("Treasury Bills are securities within the meaning of Article 8."); *Accord Matter of Bevill, Bresler & Schulman Asset Management Corp.*, 67 B.R. 557, 617 (D.N.J.1986); *Morgan Guaranty Trust Co. of New York v. Third National Bank of Hampden County*, 400 F.Supp. 383, 388 (D.Mass.1975), *aff'd*, 529 F.2d 1141 (1st Cir. 1976). Conn.Gen.Stat. § 42a–8–321(1) provides that:

A security interest in a security is enforceable and can attach only if it transferred to the secured party or a person

---

5. Conn.Gen.Stat.Ann. § 42a–9–106 (West 1990). "General Intangibles means any personal property, including things in action, other than goods, accounts, chattel paper, documents, instruments, and money."

6. CNB's Initial Memorandum at 10 citing: *In re Bell Fuel Corp.*, 99 B.R. 602 (E.D.Pa.1989); *Kapp v. United States*, 20 U.C.C.Rep.Serv. 1355, 1357, 1976 WL 934 (N.D.Ill.1976); *Lazere Financial Co. v. Palmetto Pump & Irrigation, Inc. (Matter of Palmetto Pump & Irr., Inc.)*, 81 B.R. 109, 111

(Bankr.M.D.Fla.1987); *Great Western Nat'l Bank v. Hill (Matter of Estate of Hill)*, 27 Or.App. 893, 557 P.2d 1367 (1976); *Friedman, Lobe & Block v. C.L.W. Co.*, 9 Wash.App. 319, 512 P.2d 769 (1973).

7. Conn.Gen.Stat.Ann. § 42a–9–306(1) (West Supp.1991).... "'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." ...

designated by him pursuant to a provision of subsection (1) of section 42a–8–313.

CNB relies upon Conn.Gen.Stat. § 42a–8–313(1)(i) for the proposition that its security interest attached to the treasury bills. This subsection states:

Transfer of a security or a limited interest, including a security interest, therein to a purchaser occurs only: ... (i) with respect to the transfer of a security interest where the transferor has signed a security agreement containing a description of the security, at the time new value is given by the secured party.

The only provision in the CNB's security agreement remotely suggesting that it might cover investment securities is the term "instrument" in the description of collateral. This is clearly inadequate as a "description of the security." *Boston Safe Deposit and Trust Co. v. Googel (In re Googel)*, 130 B.R. 126, 128 n. 5 (Bankr. D.Conn.1991). CNB's security interest did not attach to the treasury bills or the proceeds thereof. Additional arguments raised by the trustee to this claim need not be addressed.

### E.

*Constructive Trust and Express Trust*

CNB's final contention is that trust principles are applicable under the particular circumstances of this matter. It argues that a constructive trust should be imposed on the CBT account "[b]ecause of the debtor's intentional, unjustified, inequitable, and unconscionable conduct" in disposing of the collateral outside the ordinary course of its business, converting the funds "into a form of asset which it felt would fall outside the scope of CNB's perfected security interest," and failing to notify CNB of the existence of these funds or treasury bills in order for CNB to be able to perfect same. *See* CNB's Supplemental Memorandum at 14. Inasmuch as CNB, had it desired to do so, could have drafted its security agreement to cover the debtor's inventory or to prohibit the opening of non-

CNB bank accounts, no convincing basis exists for the imposition of any constructive trust.[8]

CNB contends that an express trust was created by the following provision of the security agreement: "Borrower shall ... (g) immediately upon request by the Bank following the occurrence of an event of Default: (1) transfer possession or permit the Bank to take possession of all Collateral." CNB's Exhibit C at 5. No express trust was created if only because neither the reimbursement funds nor the treasury bills ever constituted collateral.

### IV.

### CONCLUSION

CNB's prepetition security interest never attached to the funds which constituted the CBT account. The court order dated June 29, 1990 approving the stipulation between the debtor and CNB is vacated as it affects this proceeding. CNB's motion for relief from stay in order to recover $240,883.07 under its right to adequate protection must be, and hereby is, denied. It is

SO ORDERED.

---

**8.** The security agreement contained a provision that CNB, in its discretion, could make "additional advances" of up to $1,000,000.00 if the debtor granted it a security interest in the debtor's inventory. *See* CNB's Exhibit C at 1.