**In re Alexander V. STEIN, Debtor.**

**Douglas V. Stringer and Norman Sepenuk, P.C., Plaintiffs,**

**v.**

**John H. Mitchell, Trustee, Defendant.**

**Bankruptcy No. 392–33885–rld7.**
**Adversary No. 00–3107–rld.**

United States Bankruptcy Court, D. Oregon.

April 20, 2001.

William Dickas, Portland, OR, for Plaintiff.

Howard M. Levine, Portland, OR, for Defendant.

## AMENDED MEMORANDUM OPINION

RANDALL L. DUNN, Bankruptcy Judge.

In this adversary proceeding, the plaintiffs, Douglas Stringer and Norman Sepenuk, P.C. (the "Plaintiffs"), seek to enforce

an alleged security interest to the extent of $150,000 plus interest in certain funds (the "Fund") held by John H. Mitchell (the "Trustee") for the chapter 7 bankruptcy estate of Alexander V. Stein ("Stein"). Following the trial held on January 22, 2001, I have reviewed my notes, the exhibits, and the pleadings and other submissions in the file. I also have read applicable legal authorities, both as cited to me and as located through my own research. I have considered carefully the oral testimony and arguments presented and have read counsel's submissions in detail. The following findings of fact and legal conclusions constitute the court's findings under Federal Rule of Civil Procedure 52(a), applicable in this adversary proceeding under Federal Rule of Bankruptcy Procedure 7052.

### Factual Background

Meaningful consideration of the dispute between the parties in this case requires an understanding of the events leading up to Stein's chapter 11 bankruptcy filing on July 15, 1991, and certain proceedings thereafter.

1. *The Rise and Fall of Stein.*

From 1983 through 1987, Stein received funds from various individuals and companies for investment in stocks listed on the New York Stock Exchange according to an investment strategy Stein characterized as "fully hedged arbitrages," offering investors "a totally risk free investment with rates of return as high as 50 percent." Ex. 1, pp. 1 and 19. By May 10, 1988, Stein and/or his affiliated companies owed investors principal of $7,569,234 and interest of $24,354,863, for a total of $31,924,097. Ex. 1, pp. 12–13.

Stein's activities attracted the attention of various regulatory authorities, including the Internal Revenue Service ("IRS"), the Securities and Exchange Commission ("SEC"), and the Oregon Department of Insurance and Finance, Division of Finance and Corporate Securities (the "Oregon Securities Division"). Ex. 1, pp. 1–2. On March 18, 1988, Stein signed a Consent To Entry of a Cease and Desist Order and Agreement (the "Consent Order") with the Oregon Securities Division, providing, among other things, that Stein would 1) cease and desist from offering or selling securities in Oregon; 2) cease and desist from soliciting or accepting any funds from individuals for investment purposes; 3) cease and desist from offering or selling investment advice in Oregon; and 4) repay his investors all of the principal and other amounts due them no later than June 1, 1988. Ex. 1, p. 12. Stein did not repay his investors as required pursuant to the terms of the Consent Order.

The IRS and SEC pursued a criminal investigation against Stein, based upon allegations that, in violation of money laundering, mail fraud, wire fraud and stock fraud statutes, Stein used investor funds for his personal living expenses and the purchase of personal assets, while providing investors with false financial information to maintain their confidence and to lure additional investments. Ex. 1, pp. 1, 19. After being indicted, Stein was convicted in a jury trial on 35 counts of criminal mail fraud, securities fraud, wire fraud and money laundering and ultimately served time in the federal prison at Sheridan, Oregon. Ex. H. Stein's chapter 11 bankruptcy case was converted to chapter 7 on or about November 21, 1991, and Stein was denied a discharge in chapter 7.

2. *Stein's Relationship with Burt & Gordon, P.C., and the Genesis of the Fund.*

Stein was represented with respect to the Oregon Securities Division investiga-

tion of his affairs by successor law firms Burt & Gordon, P.C.; Burt & Vetterlein, P.C.; Burt, Vetterlein & Bushnell, P.C.; and Burt & Associates (hereinafter referred to collectively as "Burt & Gordon, P.C.") from 1986 until September 25, 1989.[1] Over time, Stein experienced difficulties in paying his legal fees to Burt & Gordon, P.C.

On August 10, 1988, Stein acquired 71,500 shares of the stock of In Focus Systems, Inc. ("In Focus") for a purchase price of $572,000. On September 15, 1988, Stein executed an irrevocable stock power to Burt & Gordon, P.C. for his 71,500 shares of In Focus stock. On September 16, 1988, Stein delivered to Burt & Gordon, P.C. a stock certificate for the 71,500 shares of In Focus stock, and Burt & Gordon, P.C. memorialized the transaction by letter, including the following terms:

"Your assignment [of In Focus Stock Certificate No. 6 to Burt & Gordon, P.C.] is for the purpose of paying all outstanding fees, costs, and advances due to Burt & Gordon, P.C., by you...under our client Matter No. 5390 or otherwise, either now or in the future (hereinafter referred to as 'Obligations'). It is not a pledge of the stock, nor a transfer of a security interest in the stock. The stock will be returned to you upon full payment of the Obligations. If, however, such Obligations are not paid within 30 days of our formal, written demand therefor, Burt & Gordon, P.C., shall be free to sell the stock to satisfy the Obligations upon any terms it, in the exercise of its sole discretion, and with no obligation to you to obtain a 'best price' or otherwise look after your interests, deems appropriate. Any funds received by Burt & Gordon, P.C.,

in excess of the Obligations (including Burt & Gordon, P.C.'s costs in selling the stock, if any), shall be returned to you."

Later, Burt & Gordon, P.C. became aware that at least one of Stein's investor creditors knew of the existence of Stein's shares of In Focus stock.

On December 20, 1988, Burt & Gordon, P.C. notified the president of In Focus that Stein had pledged Stock Certificate No. 6, representing 71,500 shares of In Focus stock, to Burt & Gordon, P.C. On January 12, 1989, Stein signed a Consent to Pledge his In Focus stock to Burt & Gordon, P.C.

On September 25, 1989, Stein signed a confession of judgment in favor of Burt & Gordon, P.C., prepared by Burt & Gordon, P.C., in the amount of $54,936.23, representing unpaid attorney fees and costs, plus interest accruing at the rate of 12% per annum. On the same day, Mark Gordon wrote to Stein terminating Burt & Gordon, P.C.'s representation of Stein for nonpayment of legal fees.

On October 5, 1989, the confession of judgment was filed with the Multnomah County, Oregon Circuit Court. Thereafter, at the instigation of Burt & Gordon, P.C., notice of an execution sale of Stein's In Focus stock, to occur at the offices of Burt & Gordon, P.C., was placed in three public places by the Sheriff of Multnomah County. Prior to the execution sale, Burt & Gordon, P.C. did not contact any third party about the execution sale and did not make any effort outside of the firm to determine the value of Stein's In Focus stock.

On October 31, 1989, Burt & Gordon, P.C. purchased Stein's In Focus stock at

1. Unless noted otherwise, factual information with respect to the relationship between Stein and Burt & Gordon, P.C. is taken from the

opinion of U.S. District Judge Helen J. Frye in *Mitchell v. Burt & Gordon, P.C.*, 208 B.R. 209, 212–14 (D.Or.1997).

the execution sale at its office by bidding in $5,000 of the amount of its confessed judgment against Stein. The only person who attended the sale was Robert Burt. Based upon Burt & Gordon, P.C.'s calculation that as of October 31, 1989, $61,818.47 was due on its confessed judgment against Stein, Burt & Gordon, P.C. wrote to Stein following its $5,000 purchase of the In Focus stock at the execution sale to advise him that the amount outstanding on the judgment now was $56,818.47.

On December 28, 1990, Stein initiated litigation against Burt & Gordon, P.C. and its principals to set aside the confession of judgment signed by Stein on September 25, 1989. Also on December 28, 1990, the 71,500 shares of In Focus stock now held by Burt & Gordon, P.C. were sold in the initial public offering of stock by In Focus for $1,350,000. After deducting the costs of sale, the net balance of funds (the "Fund") was $1,262,690, which was interpled into the registry of the Multnomah County, Oregon Circuit Court.

The litigation between Burt & Gordon, P.C. and Stein, first, and then the Trustee was fought on a number of fronts, both prepetition and postpetition, for a number of years. A judgment against Burt & Gordon, P.C. for breach of fiduciary duty and receipt of a fraudulent transfer was entered by the United States District Court for the District of Oregon on or about April 21, 1997, holding that the Trustee was entitled to the Fund. 208 B.R. at 217. Burt & Gordon, P.C. did not file a timely Notice of Appeal from the District Court judgment.

3. *Background of the Present Adversary Proceeding.*

Meanwhile, back in the latter part of 1990, Stein had problems beyond his dispute with Burt & Gordon, P.C. Stein was the target of a criminal investigation by the IRS and the SEC, and he needed the services of criminal defense counsel. It was during this time that Stein contacted Mr. Norman Sepenuk, whose professional corporation is one of the Plaintiffs.

Mr. Sepenuk is a prominent member of the Portland, Oregon bar, specializing in the defense of fraud and "white collar" criminal cases, having handled the defenses in hundreds of such cases over the course of his career.

Beyond the magnitude and variety of the criminal allegations against him, Stein had another problem at the end of 1990. The parties have stipulated that he was insolvent at that time. How then to induce Mr. Sepenuk to take on his representation? Stein's solution was to offer Mr. Sepenuk a purported security interest in the Fund.

On or about December 28, 1990, Stein prepared and sent to Mr. Sepenuk a letter (the "Letter"), a copy of which is attached as Appendix "A" to this opinion; an agreement (the "Agreement"), a copy of which is attached as Appendix "B" to this opinion; and copies of two uniform commercial code financing statements, one for Oregon and one for California (the "UCC–1's"), copies of which are attached as Appendix "C" to this opinion. The Letter, the Agreement and the UCC–1's are referred to collectively herein as the "Stein Documents."

The Letter, addressed to Mr. Sepenuk, signed by Stein individually and as President of AVS CAPITAL FUND, LTD., and dated December 28, 1990, states the following:

"Per our previous discussions and verbal understandings I have this day executed UCC filings in both Oregon and California *granting your firm security interest in any proceeds from the Burt/In Focus stock transaction (see attached copies of UCC filings )*.

"I have agreed you [sic] give you a non-refundable retainer of *$300,000 (THREE HUNDRED THOUSAND DOLLARS), secured by the Burt/In Focus proceeds by UCC filings*. The retainer is split in half: $150,000.00 for the IRS defense and $150,000.00 for all other matters needing legal work including transactional, business, bankruptcy, and securities areas to include court appearances and litigation.

"I understand that to receive *immediate* representation (i.e. prior to any funding from the Burt matter) I would have to make additional arrangements." [Emphasis added.]

The Agreement is signed by Stein individually (on December 25, 1990) and as President of AVS CAPITAL FUND, LTD. (on December 28, 1990) but is not signed by Mr. Sepenuk. The Agreement, characterized as a "retainer agreement," includes the following provisions:

"1. Norm Sepenuk, P.C. shall represent Alexander Stein as an individual, and as President of AVS CAPITAL FUND, LTD., on the tax matters outlined by Russell Ward, Special Agent, of the Internal Revenue Service.

"2. *Norm Sepenuk, P.C. shall receive as compensation for the above described case a non-refundable fee of $300,000.00.* The $300,000.00 fee shall be split: $150,000.00 non-refundable fee for the IRS claims *and* $150,000.00 non-refundable fee for transactional, business, bankruptcy, and securities matters and legal services *that those areas require for a period of one year,* including court appearances and litigation and also to include also [sic] any work necessary to assist or otherwise advance the work in defense of the IRS claims.

"3. Alexander Stein will work with Norm Sepenuk to find the best possible attorney to handle the '*transactional, business*' side of the representation, but Alexander Stein retains the absolute right to confirm, or conversely, veto any selection.

"4. *The above mentioned non-refundable retainers totalling $300,000.00 (THREE HUNDRED THOUSAND DOLLARS) are secured by the attached UCC filings.*" [Emphasis added.]

The UCC-1's do *not* include any language purporting to grant a security interest in anything to Mr. Sepenuk or his professional corporation. However, they identify in each case Stein and AVS CAPITAL FUND, LTD., with the same address of 100 Wilshire Blvd. # 1600, Santa Monica, CA 90401, as DEBTOR. They also both identify Norman Sepenuk, P.C. as a SECURED PARTY. Finally, the collateral covered is described as follows:

"Prodeeds [sic] of and/or amount due from Burt, Vetterlein, & Bushnell, P.C., an Oregon professional corporation ('BVB'), pursuant to that certain letter agreement dated August 30 [or 20], 1989 [2] between BVB and debtor, or oth-

---

**2.** The Oregon UCC-1 included in Exhibit 7 dates the letter agreement as August 30, 1989, while the California UCC-1 dates the letter agreement as August 20, 1989. The copy of the Oregon UCC-1 sent by counsel for the Plaintiffs to Stein's trustee in bankruptcy on or about December 23, 1991, dates the letter agreement as August 20, 1989. *See* Exhibit BB at page 4. The difference, while intriguing, ultimately is immaterial because no letter agreement between Burt & Gordon, P.C. and Stein relating to the sale of In Focus, Inc. stock, dated either August 20 or 30, 1989, exists as far as could be established through the presentation of evidence in this case. However, there is a letter agreement between Burt & Gordon, P.C. and Stein, dated August 30, 1989, with respect to stock in Premium TV International, Inc., Premium Technology, Inc. and Premium Entertainment Network, Inc. (collectively, the "Premium Companies"). *See* Exhibit T.

erwise, relating to the sale of In Focus Systems, Inc. stock."

Mr. Sepenuk has no expertise with respect to Article 9 of the Uniform Commercial Code and did not assist in the preparation of the Stein Documents. In fact, he could not recall how he came into possession of copies of the Stein Documents. He confirmed that he did not sign the Agreement. However, he did agree to provide legal services to Stein and attempted to negotiate a plea bargain for Stein starting in late 1990.

In early 1991, Mr. Sepenuk obtained $7,000 in retainer funds from Stein. In May, 1991, Mr. Sepenuk prepared and sent to Stein a letter (the "Retainer Letter") designed to "confirm our fee agreement." *See* Exhibit U, p. 1. The Retainer Letter advises that Stein was being investigated on "various criminal tax charges and ... alleged mail fraud, securities fraud, RICO allegations, and potentially other charges." *Id.* The Retainer Letter further states that, "My retainer to represent you in connection with this investigation is $50,000," and the billing rates for services would be $225 an hour for Mr. Sepenuk and $135 an hour for any attorney assisting him. *Id.* Mr. Sepenuk acknowledges receipt of the $7,000 previously paid by Stein and advises "the balance currently due is $43,000." *Id.* He also purports to confirm that Stein agreed to pay legal fees that Mr. Sepenuk incurred in connection with "two lawsuits filed against me in Multnomah County pertaining to the UCC filing by you relating to my legal fees." *Id.* Mr. Sepenuk further purports to confirm that Stein agreed to pay him "an additional $5,000 to cover future expenses in the case, including travel to California." *Id.* Finally, Mr. Sepenuk states in a postscript that, "This also confirms that I am now relieved from my obligation to defend the two Multnomah County cases related to the UCC filings and the question of my fee." *Id.* at p. 2. Stein never signed the Retainer Letter.

Thereafter, Mr. Sepenuk continued to represent Stein both before and after his bankruptcy filing on July 15, 1991. Both of the Plaintiffs were aware of Stein's bankruptcy filing no later than the fall of 1991. *See, e.g.,* Ex. 8. However, Stein never paid Mr. Sepenuk more than the original $7,000.

In September, 1991, Mr. Stringer, one of the Plaintiffs, began working with Mr. Sepenuk as co-counsel on Stein matters, on a "contract lawyer" basis. *See* Ex. F, p. 1. That is, Mr. Stringer billed and was paid by Mr. Sepenuk rather than Stein for his services at the rate of $60 per hour.

Mr. Sepenuk testified that although his hourly rate in 1991 was $225, he rarely worked on an hourly basis. He usually would get a nonrefundable retainer from his clients and would enter into additional retainer agreements, as his work required.

Mr. Sepenuk did not maintain itemized time records for his work for Stein, but estimated that he spent 50 to 100 hours working for Stein through July 15, 1991, and an additional 25–30 hours until November 26, 1991, when he was appointed as counsel to Stein by the United States District Court for the District of Oregon (the "District Court") under the Criminal Justice Act. *See* Exhibit 19, p. 1. There are no itemized time records for Mr. Sepenuk for the balance of 1991. There are itemized time records for Mr. Stringer that reflect 36.4 hours spent representing Stein in 1991. *See* Exhibit F, pp. 1–2.

At the time Mr. Sepenuk was appointed to represent Stein by the District Court, Mr. Sepenuk did not disclose the existence of the Stein Documents. Mr. Sepenuk testified that he hoped that Stein's security arrangements for him were worth

$150,000, but he had little hope of ever seeing the money.

Thereafter, it was Mr. Stringer who performed the bulk of the services for Stein through his Superseding Indictment, criminal conviction at trial and unsuccessful appeals to the Ninth Circuit Court of Appeals and, ultimately, the United States Supreme Court by a petition for writ of certiorari. Mr. Stringer spent substantial time in bankruptcy proceedings in the Stein case, asserting attorney-client privileges and reviewing many records to guard against disclosure of privileged documents. *See* Exhibit P, p. 2. The federal government paid the Plaintiffs a total of at least $50,155.66 in fees and expenses for their representation of Stein under the Criminal Justice Act. *See* Exhibit O. All of Mr. Stringer's time was billed at the rate of $60 an hour.

Because Mr. Stringer was performing most of the services for Stein, Norman Sepenuk, P.C. assigned a portion of its interest in the Stein Documents to Mr. Stringer by letter agreement, dated either March 1 or May 5, 1993. *See* Exhibit R, pp. 1–3. Neither Mr. Sepenuk nor Mr. Stringer disclosed the existence of the Stein Documents to the Federal Public Defender until Mr. Stringer wrote to Federal Public Defender Steven T. Wax on June 14, 1993. *See* Exhibit P.

In his letter to Mr. Wax (Exhibit P, p. 3), Mr. Stringer states the following:

"Mr. Sepenuk's claim to the In Focus proceeds is *uncertain but may still be a valid claim.* He assigned an interest in his share of the In Focus proceeds to me at the time I assumed primary responsibility for the *Stein* case. If the bankruptcy trustee prevails in the lawsuit against Mr. Burt, the bulk of the proceeds of the In Focus stock will become available to Mr. Stein's creditors. We are not experts on this issue, but Mr. Sepenuk and I have been advised that under those curcumstances [sic] Mr. Stein's assignment to Mr. Sepenuk *could be valid.* Of course, if Mr. Burt ultimately prevails, Mr. Stein's assignment of the In Focus proceeds will be worthless. If any funds should ever arise out of the assignment by Mr. Stein, it is the intention of Mr. Sepenuk and me to return CJA funds to the Court.... In any event, we felt that *this contingent claim to a portion of Mr. Stein's bankruptcy estate* should be disclosed to the Court now that Mr. Sepenuk and I are submitting our vouchers." [Emphasis added.]

Neither of the Plaintiffs ever submitted a proof of claim or applied for approval of fees in the Stein bankruptcy case. The Plaintiffs never sought appointment as special counsel to Stein in the Stein bankruptcy, and they stipulated that their services in behalf of Stein provided no benefit to Stein's bankruptcy estate. Although the Complaint in this adversary proceeding was filed on May 16, 2000, the terms of the Stein Documents were not disclosed to this court by the Plaintiffs until pretrial submissions were filed on January 17, 2001, approximately nine and one half years after Stein filed his original chapter 11 bankruptcy petition.

*Issues*

Resolution of this matter requires that I address each of the following issues: (1) whether the Stein Documents created a security interest in the Fund; (2) whether the fee described in the Stein Documents is excessive; and (3) whether the fee specified in the Stein Documents constituted a fraudulent conveyance.

*Legal Discussion*

1. *The Stein Documents did not create a security interest in the Fund.*

■ Under Article 9 of the Uniform Commercial Code as adopted in Oregon,

two steps are required to create an enforceable security interest: attachment and perfection. Where collateral for an obligation is not placed in the possession of a secured party, the requirements for attachment of a security interest are set forth in the following provisions of ORS 79.2030(1):

"... [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless: (a) ... [T]he debtor has signed a security agreement which contains a description of the collateral...; (b) Value has been given; and (c) The debtor has rights in the collateral."

The term "security agreement" is defined in ORS 79.1050(1)(L) as "an agreement that creates or provides for a security interest."

Under ORS 79.3020 and 79.4010(1)(b), with certain exceptions not applicable in this case, perfection is accomplished by filing a financing statement in the office of the Oregon Secretary of State. Under ORS 79.4020(1), a financing statement is sufficient "if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor *and contains a statement indicating the types, or describing the items of collateral.*" [Emphasis added.] ORS 79.1100(1) provides that "any description of personal property is sufficient whether or not it is specific if it reasonably identifies what is described."

In analyzing alleged security arrangements between parties, the Oregon Supreme Court has noted that security agreements, first and foremost, are contracts, and the parties are free to negotiate the terms for their dealings and the extent of any security interest granted. *See*

*Community Bank v. Jones,* 278 Or. 647, 659, 566 P.2d 470, 478 (Or.1977). However, "[t]he security agreement, like any other contract, must be sufficiently certain in its terms so as to evidence the agreement of the parties." *J.K. Gill Co. v. Fireside Realty,* 262 Or. 486, 488, 499 P.2d 813, 814 (Or.1972).

Plaintiffs urge that I review the Stein Documents together in determining whether a security interest in their favor attached to the Fund and was properly perfected, and I find such review and consideration appropriate. However, following such review, and consideration of the additional evidence presented at the Trial, I find the terms of the Stein Documents so ambiguous, incomplete and in some cases, erroneous that they do not create an enforceable security interest for Plaintiffs in the Fund. My finding is based upon the following analysis of the evidence.

(a) *The amount secured is not clear.*

In their Complaint, Plaintiffs claim entitlement to $150,000 plus accrued interest. In their Trial Memorandum, Plaintiffs request 11.9% of actual interest accrued on the Fund, since by their reckoning, their claim represents 11.9% of the Fund.

The short answer to the interest issue is that nowhere in the Stein Documents is there any provision for the accrual or payment of interest to the Plaintiffs in any amount, and there has been no prior determination that Plaintiffs have an enforceable security interest in any amount in the Fund that would establish a date from which interest would accrue. However, there is a more fundamental issue with respect to the amount that the Plaintiffs' alleged security interest secures.

Mr. Sepenuk testified that he thought $150,000 was sufficient for the representation of Stein, he hoped that the security arrangement reflected in the Stein Docu-

ments was worth $150,000, and $150,000 was a reasonable fee for the services that he and Mr. Stringer provided to Stein. However, Mr. Sepenuk did not participate in preparing the Stein Documents. He did not sign the Agreement, and he did not know how he came into possession of the Stein Documents. Stein, who presumably did prepare the Stein Documents, did not testify at the Trial. Accordingly, to determine the amount secured, the best evidence is the Stein Documents themselves.

The Letter states in garbled fashion, "I [Stein] have agreed you give you a non-refundable retainer of $300,000 (THREE HUNDRED THOUSAND DOLLARS) . . . ." The Agreement states in paragraph 2, "Norm Sepenuk, P.C. shall receive as compensation for the above described case a non-refundable fee of $300,000.00." Paragraph 4 of the Agreement contains a further confirming reference to "[t]he above mentioned non-refundable retainers totalling $300,000.00 (THREE HUNDRED THOUSAND DOLLARS)." These explicit references in the Letter and the Agreement are contrary to the understanding of Mr. Sepenuk, stated repeatedly in his testimony and reflected in Plaintiffs' Complaint, that the Stein Documents secure a claim of $150,000.

### (b) The scope of services to be performed is not clear.

The Letter states that the non-refundable retainer is "split in half: $150,000 for the IRS defense and $150,000 for all other matters needing legal work including transactional, business, bankruptcy, and securities areas to include court appearances and litigation." The Agreement, which is characterized in the first line of text as a "retainer agreement," states in paragraph 2 that,

"The $300,000.00 fee shall be split: $150,000.00 non-refundable fee for the IRS claims and $150,000.00 non-refunda-

ble fee for transactional, business, bankruptcy, and securities matters and legal services that those areas require for a period of one year, including court appearances and litigation and also to include also [sic] any work necessary to assist or otherwise advance the work in defense of the IRS claims."

Paragraph 3 of the Agreement provides:

"Alexander Stein will work with Norm Sepenuk to find the best possible attorney to handle the 'transactional, business' side of the representation, but Alexander Stein retains the absolute right to confirm, or conversely, veto any selection."

Mr. Sepenuk testified that all the work he performed for Stein was criminal work, but that testimony does not clarify Plaintiffs' alleged entitlement to only $150,000 of the $300,000 non-refundable retainer or fee. The $150,000 split referenced in both the Letter and the Agreement purports to differentiate between the IRS defense or claims on one hand and legal work for transactional, business, bankruptcy and securities matters on the other. Yet, the Stein criminal investigation and, consequently, his criminal defense representation clearly encompassed more than tax claims.

The Affidavit of IRS Special Agent Russell K. Ward, dated September 19, 1991, states that a joint investigation by the IRS *and* the SEC was moving forward with regard to a number of possible criminal violations, including allegations of *stock fraud.* Ex. 1, pp. 1, 19 and 21. In the Retainer Letter, Mr. Sepenuk states that Stein was being investigated on a number of charges, including criminal tax charges and securities fraud. *See* Ex. U, p. 1. Stein's Superseding Indictment included a number of counts of alleged securities fraud, and he ultimately was convicted on seven of them. *See* Exs. G and H.

In addition, Mr. Stringer's communications with the Federal Public Defender indicate that his work for Stein involved substantial work with respect to Stein's bankruptcy proceeding, including asserting attorney-client privileges and reviewing records in order to prevent disclosure of privileged documents. *See* Ex. P, p. 2.

In these circumstances, Plaintiffs' claim to only $150,000 based upon an alleged differentiation of legal work does not appear to make sense, where the split is between IRS claims and transactional, business, bankruptcy *and* securities work. Paragraph 3 of the Agreement only compounds the confusion with its provision for Mr. Sepenuk to work with Stein to find the best possible attorney to handle 'transactional, business' legal work. There is no provision here for Stein and Mr. Sepenuk to work to find different counsel to work on bankruptcy or securities matters. Neither is there any provision for any such counsel to share in the $300,000 non-refundable fee purportedly given to Norm Sepenuk, P.C.

#### (c) *The time period for performing services is not clear.*

Mr. Sepenuk testified that the $150,000 claimed by Plaintiffs was sufficient for Stein's criminal representation and represented a reasonable fee for the services provided to Stein over the entire period of Plaintiffs' representation of Stein, a period of years. However, paragraph 2 of the Agreement provides:

"The *$300,000.00 fee* shall be split: $150,000.00 non-refundable fee for the IRS claims and $150,000.00 non-refundable fee for transactional, business, bankruptcy, and securities matters and legal services that those areas require *for a period of one year*, including court appearances and litigation and also to include also [sic] any work necessary to assist or otherwise advance the work in

defense of the IRS claims." [Emphasis added.]

The Agreement was signed as of December 25, 1990, by Stein individually and as of December 28, 1990, by Stein as President of AVS CAPITAL FUND, LTD. If the Agreement were designed to provide a retainer for one year, it would only provide for services rendered through late December, 1991. The one year limitation is inconsistent with Mr. Sepenuk's testimony as to what overall fees the Stein Documents reasonably should provide for. However, the one year limitation is not inconsistent with Mr. Sepenuk's testimony as to his practice of obtaining non-refundable retainers up front and requesting additional retainers as his work required. During oral argument, counsel for the Plaintiffs admitted that he did not know what the one year limitation in the Agreement means. With the one year limitation in the Agreement, the period of legal work to be covered by the $300,000.00 non-refundable retainer specified in the Agreement is not clear.

My understanding of the Agreement is that it may be interpreted as limited to one year of legal service. I recognize Plaintiffs take the position that they had waived the one year limitation of the Agreement by letter of December 23, 1991, from their counsel to Stein's trustee in bankruptcy, after Stein's bankruptcy filing. *See* Exhibit BB. They also argued that they informed the trustee by the same letter that the Agreement was divisible, in that it called for the services of two different attorneys, and that Mr. Sepenuk was performing only one-half of the services described by the Agreement.

Confusion again is compounded by the provision in the Letter, reflecting Stein's understanding that in order "to receive *immediate* services (i.e. prior to any funding from the Burt matter)," Stein would

have to make additional arrangements. I understand and find that provision to require current funds from Stein in order to obtain Mr. Sepenuk's services, and in fact, shortly after Stein prepared the Stein Documents, he delivered $7,000 to Mr. Sepenuk to pay for legal work.

With resolution of the litigation against Burt & Gordon, P.C. a long time off (it was not resolved at trial until 1997, and appeals continued thereafter), it is not clear what legal work, *if any,* was covered by the fee arrangement for one year's services reflected in the Agreement if legal services were contemplated by Stein and Mr. Sepenuk to be paid for *on a current basis* in advance of resolution of Burt & Gordon, P.C.'s claims to the Fund as indicated in the Letter.

### (d) *No security interest was granted in the Stein Documents.*

The first two sentences of the Letter state the following:

"Per our previous discussions and verbal understandings I have this day executed UCC filings in both Oregon and California *granting your firm security interest in any proceeds from the Burt/In Focus stock transaction (see attached copies of UCC filings).* I have agreed you [sic] give you a non-refundable retainer of $300,000 (THREE HUNDRED THOUSAND DOLLARS), *secured by the Burt/In Focus proceeds by UCC filings.*" [Emphasis added.]

Paragraph 4 of the Agreement states the following:

"The above mentioned non-refundable retainers totalling $300,000.00 (THREE HUNDRED THOUSAND DOLLARS) *are secured by the attached UCC filings.*" [Emphasis added.]

The problem with the foregoing statements is that they are not true. The UCC–1's are standard form financing statements, signed by the debtor, showing the names and addresses of the purported debtor and secured party and providing a collateral description. What they do not contain is language granting a security interest in anything. While the language of the Letter and the Agreement assumes that a security interest is granted in the UCC–1's, the Letter and the Agreement likewise do not include any language granting a security interest in the Fund.

No reported state court decision in Oregon has decided the question as to whether a standard form financing statement is enforceable as a security agreement, where no "grant" language is included. *But cf. Johns v. Park,* 96 Or.App. 314, 773 P.2d 1328 (Or.App.1989). The federal courts that have decided the issue in the Ninth Circuit and Oregon have issued a mixed set of decisions. *Compare DuBay v. Williams,* 417 F.2d 1277, 1285 (9th Cir. 1969):

"The memorandum alone is not a security agreement. A 'security agreement' is defined as 'an agreement which creates or provides for a security interest.' (Ore.Rev.Stat. § 79.1050(1)(h) (U.C.C. § 9–105(1)(h)).) The memorandum contains no words of creation or grant ."

*and In re Nipper,* 3 UCC Rep. Serv. 1178 (Bankr.D.Or.1966), *with In re Summit Creek Plywood Co., Inc.,* 27 B.R. 209, 212 (Bankr.D.Or.1982):

"Some cases have held that for a financing statement to constitute a security agreement there must be 'words of grant' of a security interest .... The better rule however is that a financing statement may constitute a security agreement if it appears that there was an intent on the part of the debtor to create a security interest in the lender."

In a set of well-drafted security documents, this particular flaw in the Stein Documents might not be dispositive, be-

cause the language used in the Letter and the Agreement arguably reflects an intent or understanding by Stein that a security interest was granted elsewhere. *See, e.g., Community Bank v. Jones,* 278 Or. at 659–64, 566 P.2d at 478–81; *see also Johns v. Park,* 96 Or.App. at 318–20, 773 P.2d at 1331–32. However, in the ambiguous and deficient Stein Documents, the lack of language granting a security interest is additional evidence that the alleged security agreement in the Stein Documents is too uncertain in its terms to be enforced.

(e) *The UCC–1's contain an adequate description of the collateral.*

■■■ Under ORS 79.1100(1), a collateral description is sufficient if it reasonably identifies what it purports to describe. However, a collateral description in a financing statement is not sufficient if it purports to "cover everything and describe nothing." *In re Softalk Pub. Co., Inc.,* 64 B.R. 523, 526 n. 1 (9th Cir. BAP 1986), *aff'd,* 856 F.2d 1328 (9th Cir.1988). Also *see In re Hillside Assoc. Ltd. Partnership,* 121 B.R. 23 (9th Cir. BAP 1990); *In re Cottage Grove Hospital,* 233 B.R. 493 (Bankr.D.Or.1999).

The collateral description in the UCC–1's states the following:

> "Prodeeds [sic] of and/or amount due from Burt, Vetterlein, & Bushnell, P.C., an Oregon professional corporation ('BVB'), pursuant to that certain letter agreement dated August 30 [or 20], 1989 between BVB and debtor, or otherwise, relating to the sale of In Focus Systems, Inc. stock."

■ On its face, the collateral description appears to be an amalgam of specific and general descriptions, but that appearance is misleading. The collateral descrip-

tion includes "[p]rodeeds [sic] of and/or amount due from Burt, Vetterlein, & Bushnell, P.C., an Oregon professional corporation ('BVB'), *pursuant to that certain letter agreement dated August 30 [or 20], 1989 . . . .*" Based upon the testimony and other evidence presented at the Trial, no such letter agreement exists. There was a letter agreement between Stein and Burt & Gordon, P.C. dated August 30, 1989, but it related to stock in the Premium Companies, stock that the Trustee has abandoned as valueless.[3]

Extracting the erroneous letter agreement reference, the remaining portion of the collateral description in the UCC–1's covers proceeds of or amount due from Burt & Gordon, P.C. "otherwise, relating to the sale of In Focus Systems, Inc. stock." While the meaning of this description, particularly in light of the mistaken letter agreement reference, is not free from doubt, I find that if a security interest in favor of Plaintiffs had attached to the Fund, the collateral description in the UCC–1's would be sufficient to perfect it.

In *Great Western Nat'l Bank v. Hill,* 27 Or.App. 893, 557 P.2d 1367 (Or.App.1976), the Oregon Court of Appeals held a bank's unperfected security assignment of proceeds in a lawsuit was a priority claim against the estate of the borrower, over the opposition of the personal representative. Prior to his death, the borrower, Mr. Hill, had agreed in negotiations with the bank to assign a portion of the proceeds from the "Wolf Corporation lawsuit" to the bank for security purposes. *Id.* at 896–98, 557 P.2d at 1369–70. Mr. Hill followed up the negotiations with a letter to his counsel in the Wolf Corporation lawsuit, stating the following:

> out the Stein Documents, presenting a further ambiguity.

---

**3.** This raises the interesting possibility that Stein may have meant stock of the Premium Companies rather than of In Focus through-

"In reference to the Wolf–69 suit now being handled by your firm I have agreed with Mr. Robert Price of the Great Western Bank that the first net proceeds of any settlement payment up to an amount of $36,022.99 or the net amount owned by me at the time shall be paid to them." *Id.* at 898, 557 P.2d at 1370.

Mr. Hill's attorney acknowledged the assignment by letter. *Id.* at 899, 557 P.2d at 1370.

In the course of its decision, the Oregon Court of Appeals found that the description of the "first net proceeds" from the subject litigation was a sufficient description of the collateral for purposes of ORS Chapter 79. *Id.* at 903–04, 557 P.2d at 1373.

While the collateral description considered in the *Hill* case is more accurately detailed, it is fundamentally similar to the collateral description used in the UCC–1's.

█ In addition, there was evidence presented at the Trial to the effect that once the UCC–1's were filed, some of Stein's creditors determined that Mr. Sepenuk claimed an interest in the Fund and filed a lawsuit against Mr. Sepenuk to set aside any such interest as a fraudulent conveyance. *See, e.g.,* Ex. U. pp. 1–2. Since the purpose of the collateral description in a Uniform Commercial Code financing statement is to provide notice to third parties as to what assets of a debtor a creditor claims a security interest in, the collateral description in the UCC–1's appears to have performed its notice function.

tion. *See In re Softalk Pub. Co., Inc.,* 856 F.2d at 1330.

█ Accordingly, I find the collateral description in the UCC–1's, despite its flaws, to be sufficient to identify the subject collateral, *i.e.,* the Fund. However, an adequate collateral description alone is insufficient to create an enforceable security interest where material terms of the parties' agreement are unclear and/or unstated. *See In re Nipper,* 3 UCC Rep. Serv. 1178, 1966 WL 8827 (Bankr.D.Or.1966).

(f) *Summation of Findings.*

I find that the Stein Documents do not create an enforceable security interest in the Fund because the Stein Documents are ambiguous, inconsistent and at times, erroneous in stating certain fundamental terms, including the payment amount secured, the consideration in terms of services to be performed for the retainer or fee involved, the time period for services to be rendered, and whether a security interest is granted at all. There is no agreement between Stein and Norman Sepenuk, P.C. set forth in the Stein Documents that is sufficiently certain to enforce.

It is tempting to speculate that Stein, who managed to attract millions of dollars from investors with big money promises that proved illusory, sold one final chunk of "blue sky" to his criminal lawyers. In any event, Stein managed to obtain a complete criminal defense from pre-indictment negotiation through indictment, trial, conviction and appeals up to the United States Supreme Court for $7,000 out of his pocket. I find that Plaintiffs have no enforceable security interest in the Fund.[4]

---

4. In light of my finding that Plaintiffs have no security interest in the Fund, Plaintiffs have no more than an unsecured claim for legal services under whatever executory contract existed between them and Stein when he filed his bankruptcy petition in July, 1991. *See In re Pacific Express, Inc.,* 780 F.2d 1482, 1486

(9th Cir.1986). Since such executory contract never was assumed in Stein's bankruptcy, it is deemed rejected under § 365(d)(1) of the Bankruptcy Code. Further, since Plaintiffs never filed a proof of claim in the Stein bankruptcy, their unsecured claim is untimely.

2. *The fee described in the Stein Documents is excessive.*

█ There are two alternative bases for my holding that the security interest claimed by the Plaintiffs is not enforceable against the Fund. Section 329(a) of the Bankruptcy Code provides:

"Any attorney representing a debtor in a case under this title, or in connection with such a case, *whether or not such attorney applies for compensation under this title,* shall file with the court a statement of the compensation paid or agreed to be paid, *if such payment or agreement was made after one year before the date of filing of the petition, for services to be rendered or to be rendered in contemplation of or in connection with the case by such attorney,* and the source of such compensation." [Emphasis added.]

The Stein Documents, dated as of late December, 1990, were prepared well within one year prior to Stein's July, 1991 bankruptcy filing. Yet, the alleged fee arrangements included therein were not disclosed to this court until after the filing of Plaintiffs' Complaint in this adversary proceeding, more than nine years later.

Section 329(b) of the Bankruptcy Code further provides that "[i]f such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement...to the extent excessive...." The legislative history states that Section 329(b) "permits the court to deny compensation to the attorney, to cancel an agreement to pay compensation, or to order the return of compensation paid, if the compensation exceeds the reasonable value of the services provided." H. Rept. No. 95–595 to accompany H.R. 8200, 95th Cong., 1st Sess. (1977), at 329, U.S.Code Cong. & Admin.News 1978, pp. 5963, 6285.

Federal Rule of Bankruptcy Procedure

Federal Rule of Bankruptcy Procedure 2017(a) provides:

"On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor or before the entry of the order for relief in an involuntary case, to an attorney for services rendered or to be rendered is excessive."

I find that the Stein Documents were prepared and delivered in contemplation of Stein's bankruptcy filing, both because he was insolvent at the time they were prepared and because the need for bankruptcy related legal services is discussed both in the Letter and the Agreement.

Mr. Sepenuk testified that the reasonable value of all the legal services performed by Plaintiffs for Stein was $150,000. Yet, the Stein Documents repeatedly state that the non-refundable retainer or fee for the services of Norman Sepenuk, P.C. is $300,000, twice as much.

If the one year limitation set forth in the Agreement is applied, the disparity is even greater. Mr. Sepenuk testified that he spent between 75 and 130 hours in representing Stein up until November 26, 1991, when he was appointed as Stein's counsel under the Criminal Justice Act. No further time is itemized for Mr. Sepenuk in 1991. At his hourly rate at that time of $225 an hour, Mr. Sepenuk's fees on an hourly basis would total somewhere between $16,875 and $29,250 for all services he rendered in Stein's behalf prior to November 26, 1991.

Mr. Stringer itemized a total of 36.4 hours representing Stein in 1991. At the

3002(c).

$60 per hour contract rate that he charged Mr. Sepenuk for those services, the total of Mr. Stringer's fees is $2,184.

On an hourly basis, the bills for Plaintiffs' services to Stein during the one year following the date of the Stein Documents would range from a minimum of approximately $19,059 up to a maximum of approximately $31,434–at most, little more than one tenth the amount of the fee described in the Stein Documents.

Whether the reasonable value of the legal services performed by the Plaintiffs for Stein is 6.4%, 10.5% or even 50% of the fee amount stated in the Stein Documents, the $300,000 non-refundable retainer or fee described in the Stein Documents is clearly excessive. As stipulated by the parties, the legal services performed by the Plaintiffs for Stein provided no benefit to the Stein bankruptcy estate. Accordingly, I find that the $300,000 fee arrangement in the Stein Documents, if otherwise enforceable, should be and is canceled pursuant to Section 329(b) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2017(a) and should not be paid from assets of the estate. *See In re Dixon,* 143 B.R. 671 (Bankr.N.D.Tex.1992).

The Plaintiffs' claim here was for $150,000 in compensation for what eventually amounted to Plaintiffs' estimate of approximately 1000 hours of services covering the entire multi-year period of Plaintiffs' representation of Stein. In addition, Plaintiffs represented that approximately one-third of a recovery would have been returned to the District Court in reimbursement for the fees paid by the District Court pursuant to their appointment. Nothing in these findings relating to excessive fees or fraudulent conveyance is meant to reflect adversely on Plaintiffs' integrity with respect to their claim in this case.

3. *The fee described in the Stein Documents was a fraudulent conveyance.*

██ Under Section 548(a)(1)(B) of the Bankruptcy Code, the trustee may avoid any transfer by the debtor of an interest in property, or any obligation incurred by the debtor, made or incurred within one year prior to the debtor's bankruptcy filing, if the debtor:

"(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and was insolvent on the date that such transfer was made or such obligation was incurred...."

The parties have stipulated that Stein was insolvent at the time that the Stein Documents were prepared and delivered to Mr. Sepenuk. As set forth in Section 2 above, the reasonable value of the services performed by Plaintiffs for Stein was no more than half, and maybe substantially less, of the amount of the non-refundable retainer or fee specified in the Stein Documents. Accordingly, I find that Plaintiffs did not provide a reasonably equivalent value to Stein for the fee specified in the Stein Documents. To the extent the fee arrangement in the Stein Documents otherwise would be enforceable, I find that it is a fraudulent conveyance and is avoided pursuant to the provisions of Section 548(a)(1)(B) of the Bankruptcy Code.

*Conclusion*

I have found that the alleged security interest provided for in the Stein Documents is not enforceable against the Fund. I further have found that the fee specified in the Stein Documents is excessive and if otherwise enforceable, should be canceled. Likewise, I have found that the fee arrangement specified in the Stein Documents, if otherwise enforceable, is a fraudulent conveyance and should be set aside. I find in favor of the defendant Trustee on

Plaintiffs' Complaint. An appropriate form of judgment shall be entered contemporaneously with the Amended Memorandum Opinion.

## APPENDIX A

December 28, 1990

Norm Sepenuk, Esq.
Norm Sepenuk, P. C.
1001 S.W. Fifth Avenue, Suite 1800
Portland, Oregon 97204

Dear Mr. Sepenuk:

Per our previous discussions and verbal understandings I have this day executed UCC filings in both Oregon and California granting your firm security interest in any proceeds from the Burt/In Focus stock transaction (see attached copies of UCC filings).

I have agreed you give you a non-refundable retainer of $300,000.00 (THREE HUNDRED THOUSAND DOLLARS), secured by the Burt/In Focus proceeds by UCC filings. The retainer is split in half: $150,000.00 for the IRS defense and $150,000.00 for all other matters needing legal work including transactional, business, bankruptcy, and securities areas to include court appearances and litigation.

I understand that to receive immediate representation (i.e. prior to any funding from the Burt matter) I would have to make additional arrangements.

Very truly yours,

Alexander Stein, individually

Alexander Stein, President
AVS CAPITAL FUND, LTD.

Exhibit 7
Page 1 of 4

## APPENDIX B

## A G R E E M E N T

This retainer agreement is between Norm Sepenuk, P. C. and Alexander Stein, an individual, as well as AVS Capital Fund, Ltd., an Oregon corporation.

It is hereby agreed as follows:

1. Norm Sepenuk, P. C. shall represent Alexander Stein as an individual, and as President of AVS Capital Fund, Ltd., on the tax matters outlined by Russell Ward, Special Agent, of the Internal Revenue Service.

2. Norm Sepenuk, P. C. shall receive as compensation for the above described case a non-refundable fee of $300,000.00. The $300,000.00 fee shall be split: $150,000.00 non-refundable fee for the IRS claims and $150,000.00 non-refundable fee for transactional, business, bankruptcy, and securities matters and the legal services that those areas require for a period of one year, including court appearances and litigation and also to include also any work necessary to assist or otherwise advance the work in defense of the IRS claims.

3. Alexander Stein will work with Norm Sepenuk to find the best possible attorney to handle the "transactional, business" side of the representation, but Alexander Stein retains the absolute right to confirm, or conversely, veto any selection.

4. The above mentioned non-refundable retainers totalling $300,000.00 (THREE HUNDRED THOUSAND DOLLARS) are secured by the attached UCC filings.

UNDERSTOOD AND AGREED:

Alexander Stein, President
AVS CAPITAL FUND, LTD.

Alexander Stein, individual

Norm Sepenuk, P. C.
By: Norm Sepenuk

Exhibit 7
Page 2 of 4

# APPENDIX C

## FINANCING STATEME    STANDARD FORM UCC-1

PLEASE TYPE
READ INSTRUCTIONS ON BACK BEFORE FILLING OUT FORM.    CUSTOMER NUMBER

SECY OF STATE ORE

Dec 31   2 47 PM '90

A. Check (x) one: ☒ DEBTOR NAME, ☐ CONSIGNEE, ☐ LESSEE    Social Sec. number or TIN
(If individual list last name first)

1. Stein, Alexander    541 52 0043

2. AVS Capital Fund, Ltd.

3.
(Last Name)          (First Name)          (Middle)

DEBTOR MAILING ADDRESS:    Total Debtor Names:
100 Wilshire Blvd. #1600
Santa Monica, CA   90401   &   (Same)

Reserved for Filing Officer Use

B. Check (x) one: ☒ SECURED PARTY  ☐ CONSIGNOR,  ☐ LESSOR    C. ASSIGNEE NAME AND ADDRESS (if any)
NAME AND ADDRESS (from which security information is obtainable)

Norman Sepenuk, P.C.
1001 S.W. Fifth Ave. Suite 1800
Portland, Oregon   97204
Telephone Number:   503  221 1633    Telephone Number:

D. This financing statement covers the following types (or items) of collateral (ORS 79.4020)
Total number of attachments:

Proceeds of and/or amount due from Burt, Vetterlein, & Bushnell, P.C., an Oregon professional corporation ("BVB"), pursuant to that certain letter agreement dated August 30, 1989 between BVB and debtor, or otherwise, relating to the sale of In Focus Systems, Inc. stock.

Check (x) if covered. ☐ PROCEEDS of collateral are also covered    ☐ PRODUCTS of collateral are also covered

E. DEBTOR'S SIGNATURE NOT REQUIRED. This statement is filed without the debtor's signature to perfect a security interest in collateral (if applicable check box): (1) ☐ collateral already subject to a security interest in another jurisdiction; (2) ☐ Which is proceeds of the described original collateral which was perfected; (3) ☐ Collateral as to which the filing has lapsed; or (4) ☐ Collateral acquired after a change of name, identity or corporate structure of debtor.    F. DEBTOR IS A TRANSMITTING ☐ UTILITY (ORS 79.4010)

Debtor hereby authorizes the Secured Party (or Consignor or Lessor) to file a carbon, photographic or other reproduction of this form, financing statement or security agreement as a financing statement under ORS Chapter 79.

By:                                      By:
Required Signature(s)

TERMINATION STATEMENT  This statement of termination/lapse is presented for filing pursuant to the Uniform Commercial Code. The Secured Party certifies that they no longer claim interest under the financing statement bearing the file number shown above in these systems: UCC ☐, EFS ☐, Both ☐.

## FARM PRODUCTS EFFECTIVE FINANCING STATEMENT FORM EFS-1

This FARM PRODUCTS EFFECTIVE FINANCING STATEMENT is filed with the filing officer pursuant to ORS Chapter 79. This statement remains effective for a period of five years as provided for by ORS Chapter 79.

| FARM PRODUCT CODE | COUNTY CODE. | CROP YEAR. (if applicable) | AMOUNT (if applicable) | DESCRIPTION/LOCATION (if applicable) |
|---|---|---|---|---|
| — | — | — | | |
| — | — | — | | |
| — | — | — | | |

EFS Statement requires signature of debtor(s) and secured party(ies).

By:                    By:
Signature of Secured Party

By:
Signature of Debtor(s)

Source of Payment:
Cash ☐
Check ☐ #

Visa/MasterCard ☐
(see instruction 8-0 on reverse of Original copy)

RETURN ACKNOWLEDGEMENT COPY TO: (name and address)
Norman Sepenuk, P.C.
1001 S.W. Fifth Ave. Suite 1800
Portland, Oregon 97204

Submit completed form to:
Secretary of State, UCC Section
Capitol Bldg., Room 41
Salem, OR 97310
(503) 378-4146
FAX (503) 373-1166

Please do not type outside of bracketed area

Stevens-Ness Law Publishing Company
Portland OR 97204 - (503) 223-7137

Exhibit 7
Page 3 of 4

This FINANCING STATEMENT is presented for filing pursuant to the California Uniform Commercial Code.

| 1. DEBTOR (LAST NAME FIRST—IF AN INDIVIDUAL) | | 1A. SOCIAL SECURITY OR FEDERAL |
|---|---|---|
| Stein, Alexander AND AVS Capital Fund, Ltd. | | 541 52 0043 / 7 |
| 1B. MAILING ADDRESS | 1C. CITY, STATE | 1D. ZIP C |
| 100 Wilshire Blvd. 16th Floor | Santa Monica, CA | 9040 |
| 2. ADDITIONAL DEBTOR (IF ANY) (LAST NAME FIRST—IF AN INDIVIDUAL) | | 2A. SOCIAL SECURITY OR FEDERAL |
| AVS CAPITAL FUND, LTD. | | |
| 2B. MAILING ADDRESS | 2C. CITY, STATE | 2D. ZIP C |
| 100 Wilshire Blvd. 16th Floor | Santa Monica, CA | 90401 |
| 3. DEBTOR'S TRADE NAMES OR STYLES (IF ANY) | | 3A. FEDERAL TAX NUMBER |

| 4. SECURED PARTY | 4A. SOCIAL SECURITY NO., FEDERAL TA. OR BANK TRANSIT AND A.B.A. NO. |
|---|---|
| NAME Norman Sepenuk, P.C. | |
| MAILING ADDRESS 1001 SW Fifth Ave. Suite 1800  97204 | |
| CITY Portland  STATE Oregon  ZIP CODE | |
| 5. ASSIGNEE OF SECURED PARTY (IF ANY) | 5A. SOCIAL SECURITY NO., FEDERAL TAX OR BANK TRANSIT AND A.B A. NO. |
| NAME | |
| MAILING ADDRESS | |
| CITY  STATE  ZIP CODE | |

6.. This FINANCING STATEMENT covers the following types or items of property (include description of real property on located and owner of record when required by instruction 4).

Prodeeds of and/or amounts due from Burt, Vetterlein, & Bushnell, PC an Oregon professional corporation ("BVB"), pursuant to that certain letter agreement between BVB and debtor, dated August 30, 1989, or ot relating to the sale of In Focus Systems, Inc. Stock.

| 7. CHECK IF APPLICABLE ☒ | 7A. ☒ PRODUCTS OF COLLATERAL ARE ALSO COVERED | 7B. DEBTOR(S) SIGNATURE NOT REQUIRED IN ACCORDANCE WITH INSTRUCTION 5(a) ITEM: ☐(1) ☐(2) ☐(3) ☐(4) |
|---|---|---|

| 8. CHECK IF APPLICABLE ☒ | ☐ DEBTOR IS A "TRANSMITTING UTILITY" IN ACCORDANCE WITH UCC § 9105 (1) (n) |
|---|---|

9.
► SIGNATURE(S) OF DEBTOR(S)  DATE: 12/24/90

AVS CAPITAL FUND, LTD  Alexander Stein
TYPE OR PRINT NAME(S) OF DEBTOR(S)

►
SIGNATURE(S) OF SECURED PARTY(IES)

TYPE OR PRINT NAME(S) OF SECURED PARTY(IES)

10. THIS SPACE FOR USE OF FILING OFFI (DATE, TIME, FILE NUMBER AND FILING OFFICER)

RECEIVED 90 DEC 28 PM 4:28

11. Return copy to:  Exhibit 7  Page 4 of 4

NAME
ADDRESS  Norman Sepenuk, P.C.
CITY  1001 SW Fifth AVe  Suite 1800
STATE  Portland, Oregon  97204
ZIP CODE

(3) FILE COPY—SECURED PARTY

FORM UCC-1 — FILING FEE $5.00
Approved by the Secretary of State